**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

**Kristina Barton**

    **v.**

**Michael J. Astrue, Commissioner,**
**Social Security Administration**

Case No. 10-cv-151-PB
Opinion No. 2011 DNH 095

**MEMORANDUM AND ORDER**

Kristina Barton moves to reverse the Commissioner of Social
Security's determination that she is not eligible for disability
insurance benefits ("DIB").  She focuses her appeal on the
Commissioner's determination that, despite some mental
limitations, her Residual Functional Capacity ("RFC") allowed
her to perform work that is available in the national economy
and therefore she was not disabled during the relevant time
period.  For the reasons set forth below, I affirm the
Commissioner's decision.

**I.  BACKGROUND**[1]

Barton first filed for DIB on July 24, 2007, alleging

---

[1] The background information is drawn from the Joint Statement of
Material Facts submitted by the parties (Doc. No. 10) and the
Administrative Record.  Citations to the Administrative Record
are indicated by "Tr."

disability as of April 28, 2007, due to epilepsy, bipolar
disorder, and migraines.  (Tr. 142).[2]  Barton's applications were
denied initially.  (Tr. 55-62).  Barton requested a hearing
before an Administrative Law Judge ("ALJ"), and on November 2,
2009 the ALJ issued a decision finding that plaintiff was not
disabled.  (Tr. 4-16).

In October 2006, prior to her alleged onset date, Barton
was seen for her mental condition at Mid-State Health Center.
(Tr. 508).  She was diagnosed with "Post Traumatic Stress
Disorder" (PTSD), and the severity of her condition was noted as
"moderate" as it affected her "intimacy."  (Tr. 508-11).  Barton
was also diagnosed with "Major Depressive Episode, recurrent,
severe without psychosis," which was improving based on her
reduced symptoms of depression and increased energy.  (Tr. 508).
Her symptoms included weight loss, anhedonia, insomnia, fatigue,
feeling worthless, feeling guilty, indecisiveness, depressed
mood, and crying spells.  (Tr. 511).  She was noted to have a
dysthymic or anxious mood but an appropriate affect, normal
speech and appearance, a grossly intact cognitive function, and

---

[2]  In this appeal, however, Barton only challenges the ALJ's
determinations as they relate to her alleged mental limitations.
Therefore I will not address her history of seizures and
headaches.

no homicidal or suicidal ideation.  (Tr. 511).  She was assigned a Global Assessment of Functioning (GAF) score of between 51 and 60.  (Tr. 511).[3]

On September 6, 2007, the Mid-State Health Center completed a Mental Impairment Questionnaire regarding Barton's mental health status.  (Tr. 513-14).  She demonstrated appropriate behavior during her evaluation and her speech was within normal limits.  (Tr. 513).  Her mood was characterized as "somewhat depressed" but she showed no evidence of suicidal or homicidal ideation.  (Tr. 513).  Barton's affect was appropriate and "full range."  (Tr. 513).  Her thought process was within normal limits and she had no evidence of any psychotic symptoms or obsessions, excessive rumination, or delusions, although she did have some "oddities" in her perceptions and thoughts of mild paranoia.  (Tr. 513).  Barton's sensorium functions[4] were within

---

[3] The GAF Scale is used by doctors to assess an individual's level of psychological, social, and occupational functioning. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-33 (4th ed., text rev. 2000) ("DSM IV").  GAF scores in the range of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  DSM-IV 34.

4 Sensorium functions are characteristics related to "orientation, memory, learning, attention and concentration,

normal limits and her condition was noted to have only a "minimal impact" on her activities of daily living.  (Tr. 514). She was described as having problematic interpersonal relationships with others due to her inability to control her anger.  (Tr. 514). Finally, Barton was noted to respond to stress negatively and inappropriately, although her condition was found to have only "minimal interference" with her task performance.  (Tr. 514).

On October 10, 2007, Barton was seen by Mid-State Health Center because of her ongoing problems with seizures and bipolar disorder.[5]  (Tr. 519).  Her neurologist suggested that she see a psychologist to assist with mood management during her pregnancy.  (Tr. 519).  Barton's condition was described as "stable" and "improving" as she admitted that she was learning to "leave situations and take a walk."  (Tr. 519).  She was

---

fund of information, etc."  (Tr. 513).  Sensoria are defined as "organ[s] of sensation."  Stedman's Medical Dictionary (Stedman's) at 1619 (27th ed. 2000).

[5]  The medical record is not clear on when Barton was officially diagnosed with bipolar disorder.  Her records from Mid-State Health Center reference a pre-existing diagnosis, and when Barton was evaluated by Dr. Hutton in 2009 she reported that she "was initially diagnosed with bipolar disorder at the age of sixteen."  (Tr. 596).  The parties do not appear to dispute that Barton was diagnosed at some point prior to her application for disability.

irritable and angry most days and she experienced rapid mood
swings followed by crying spells.  (Tr. 519).  She also noted
that her father-in-law was going to buy her and her husband a
trailer so they would have space once the baby arrived, which
reduced her anxiety.  (Tr. 520).  Barton indicated that she was
seeing a "positive impact" from her cognitive behavioral
therapy, which "empowered" her to have a "better way to manage
emotions."  (Tr. 519).

On November 13, 2007, Dr. Michael Schneider, a state agency
physician, completed a psychiatric review technique form (PRTF)
relative to Barton's mental condition.  (Tr. 521-34).  Dr.
Schneider found that Barton's condition had improved with
treatment and that her condition was not expected to be severe
after April 2008 if she continued with treatment.  (Tr. 533).
In sum, Dr. Schneider concluded that Barton's condition was
severe, but was not expected to last for twelve months.  (Tr.
521).

On February 24, 2009, Barton was seen again by Mid-State
Health center because of her history of seizures and bipolar
disorder. (Tr. 549).  She underwent a behavioral health exam
which indicated that her appearance, speech, and affect were
normal although she was still having mood swings.  (Tr. 549).

Barton was fully oriented, did not have suicidal or homicidal ideation and was assigned a GAF score of between 61 and 70. (Tr. 549).[6]

On July 16, 2009, Karen Gilbert, a neurological nurse, prepared a Medical Source Statement regarding Barton's ability to perform work-related activities. (Tr. 586-94). Gilbert noted that Barton was able to occasionally climb stairs or ramps, stoop, kneel, crouch, and crawl, but never balance or climb ladders. (Tr. 589). She also concluded that Barton was subject to multiple environmental limitations, but was nevertheless capable of shopping, traveling without a companion for assistance, ambulating independently, walking at a reasonable pace, using public transportation, climbing steps using a single hand rail, preparing simple meals, conducting personal hygiene, and handling or using paper files. (Tr. 590-91). Gilbert opined that Barton had mild limitations with respect to understanding, remembering, and carrying out simple instructions, and moderate limitations with respect to understanding and carrying out complex instructions. (Tr. 593).

---

[6] A GAF of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social stressors and no more than a slight impairment in social, occupational, or school functioning. DSM-IV 34 (4th Ed. 2000).

6

Barton was not found to have any limitation with respect to her interaction with co-workers, supervisors, or the public.  (Tr. 594).

On July 21, 2009, Anna Hutton, Psy.D., evaluated Barton's functional loss due to her bipolar disorder.  (Tr. 596-603). Barton reported a history of manic and depressive episodes marked by irritability, easily "flipping out," struggling to get out of bed, racing thoughts, panic attacks, and concentration difficulties  (Tr. 596).  Hutton observed Barton to be well dressed and groomed.  (Tr. 596).  Upon examination, Barton had a normal appearance, good eye contact, and a "high level" of energy.  (Tr. 598). She demonstrated good affect and clear speech.  (Tr. 598). She denied delusions, loose associations, misinterpretations, preoccupations, obsessions, phobic ideas, and suicidal or homicidal ideation.  (Tr. 598).  Barton was oriented, but her performance on the Digit Span subtest[7] for working memory was below average.  (Tr. 598).  Barton's performance on the WAIS Information subtest was in the average range.  (Tr. 598).

---

[7]  The Digit Span subtest is a part of the Wechsler Adult Intelligence Scale, a method of measuring general intelligence in adults.  Stedman's at 1596.

Barton reported that her activities of daily living included caring for her children, running errands, and cleaning the house with help from her mother, aunts, and grandmother. (Tr. 597-599).  She stated that she is generally independent for all activities of daily living, although she prefers to go shopping when other people are there to help her.  (Tr. 598-99). She also stated that she enjoyed cooking and was able to drive, but that her habits were restricted due to her seizures.  (Tr. 599).  Barton admitted to caring for her home, performing personal grooming, and maintaining her finances independently. (Tr. 599).

Overall, Dr. Hutton opined that Barton could understand directions within normal limits, though her ability to remember directions and her ability to complete tasks in a work setting could be impacted by her poor working memory.  (Tr. 599).  Her social functioning was within normal limits when her mood was stable.  (Tr. 599).  Dr. Hutton found Barton's concentration and task completion to be problematic based on her below average performance on the working memory test and she stated it was "quite likely" that Barton's ability to persist with activities and maintain a steady pace was "significantly limited" and could impact her ability to complete tasks.  (Tr. 599).  She further

concluded that Barton's decision-making skills were within normal limits and her ability to adapt to stress common to the work environment depends on whether or not she was exposed to the general public or was in a comfortable work setting.  (Tr. 599).

Barton testified at the hearing before the ALJ that she had worked consistently from 2004-2007 doing cashier work and housekeeping.  (Tr. 21).  With respect to her mental health condition, she testified that she was seeing Dr. Runyon on an "as needed" basis for bipolar disorder and a mood disorder. (Tr. 31-32).  She attested to shopping for her family and taking care of the family's finances online and admitted to using the computer for email, Facebook, and to play games.  (Tr. 39). Barton testified that she could "probably" work in a job without public interaction that was limited to simple tasks as long as her seizures did not affect her performance.  (Tr. 41-42).  She also stated that she could take care of her son independently if she needed to, twenty-four hours a day, every day, but upon further questioning by her attorney, she stated that she wasn't sure if she could function without all her supports, as she had never been in such a situation before.  (Tr. 44-45).

A vocational expert ("VE") also testified at the hearing.
(Tr. 48-52).  The ALJ asked the VE to assume a hypothetical
younger individual with the same work experience as Barton.
(Tr. 49).  The ALJ further asked the VE to assume that the
individual could perform light work as defined by the
regulations with work that required standing or walking, and
sitting for up to six hours in an eight-hour work day.  (Tr.
49).  The ALJ further asked the VE to assume that all postural
activities (balancing, stooping, kneeling, crouching, crawling)
would be occasional, that the individual would need to avoid
scaffolds, hazardous exposure, or hazards of any kind, and that
the individual would be restricted to simple, repetitive,
routine tasks, essentially unskilled work, with no public
contact and only occasional interaction with co-workers and
supervisors.  (Tr. 50).  The ALJ asked the VE whether such an
individual could perform other work existing in significant
numbers in the national economy.  (Tr. 51).  The VE testified
that an individual with such limitations could work as a small
products assembler or assembly machine tender.  (Tr. 51-52).

The ALJ found at step one of the sequential evaluation
process that Barton had not engaged in substantial gainful
activity since her alleged onset date of April 28, 2007.  (Tr.

10, at Finding 2). At step two, the ALJ found that Barton suffered from the following severe impairments: non-epileptic seizures, migraine headaches, and bi-polar disorder. (Tr. 10, at Finding 3). The ALJ went on to find, however, that those impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 10-11, at Finding 4). At step four, the ALJ considered whether Barton could return to her past relevant work. In doing so, the ALJ gave substantial weight to the opinion of Dr. Hutton in finding that Barton retained the RFC to perform less than the full range of light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b). (Tr. 12, 14, at Finding 5).

The ALJ further found that Barton could lift ten pounds frequently and twenty pounds occasionally, sit, stand or walk for six hours in an eight hour work day, occasionally balance, stoop, kneel, crouch, or crawl, and that she could perform simple, repetitive, routine tasks. (Tr. 12, at Finding 5). The ALJ further determined that Barton needed to avoid ladders, ropes, scaffolds, and all hazards, and that she could not tolerate interaction with the public, but could tolerate occasional interaction with co-workers and supervisors. (Tr. 12, at Finding 5). At step four, the ALJ determined that Barton

11

did not have any past relevant work.  (Tr. 15, at Finding 6).

Accordingly, at step five the ALJ considered Barton's ability to

perform other jobs existing in significant numbers in the

national economy.  In this regard, the ALJ relied upon the

Medical-Vocational guidelines as well as the VE's testimony, in

finding that Barton could perform other work and was not,

therefore, disabled within the meaning of the Act.  (Tr. 16, at

Finding 11).


## II.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I am authorized to review the

pleadings submitted by the parties and the transcript of the

administrative record and enter a judgment affirming, modifying,

or reversing the "final decision" of the Commissioner of Social

Security.  Review is limited to determining whether the ALJ used

the proper legal standards and found facts based upon the proper

quantum of evidence.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652,

655 (1st Cir. 2000).

The ALJ's findings of fact are accorded deference as long

as they are supported by substantial evidence.  Ward, 211 F.3d

at 655.  Substantial evidence to support factual findings exists

"if a reasonable mind, reviewing the evidence in the record as a

whole, could accept it as adequate to support his conclusion."
Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st
Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health &
Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the
substantial evidence standard is met, factual findings are
conclusive even if the record "arguably could support a
different conclusion."  Ortiz, 955 F.2d at 770.  Findings are
not conclusive, however, if they are derived by "ignoring
evidence, misapplying the law, or judging matters entrusted to
experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).
The ALJ is responsible for determining issues of credibility and
for drawing inferences from evidence on the record.  Ortiz, 955
F.2d at 769.  It is the role of the ALJ, not the role of the
court, to resolve conflicts in the evidence.  Id.

### III.  ANALYSIS

Barton essentially makes two claims in her appeal.  First,
she contends that the ALJ improperly calculated her residual
functional capacity.  Second, she argues that the ALJ erred in
finding that Barton was capable of performing other work in the
national economy.  I will address each issue in turn.

13

A.   **The RFC Determination**

Barton contends that the ALJ did not consider or properly assess all of the medical evidence that pertained to her RFC. Specifically, Barton argues that the ALJ chose to adopt some portions of Dr. Hutton's psychiatric evaluation while ignoring other significant functional limitations that were outlined in the evaluation.  For example, Barton faults the ALJ for failing to consider Dr. Hutton's determinations that: her "ability to concentrate on work and to sustain attention is problematic;" "her ability to persist with activities and maintain a steady pace is significantly limited and could preclude her ability to complete tasks;"[8] and "her ability to adapt to stress depended on whether or not she was exposed to the general public or was in a "comfortable setting."  (Tr. 599).  The Commissioner replies that the ALJ did in fact take into account all of Dr. Hutton's observations, and that in any event the commentary from Dr.

---

[8]  Barton also argues that the ALJ ignored Dr. Hutton's recommendation that Barton could understand instructions only if the limitations were in writing.  As the Commissioner points out, however, this argument is a mischaracterization of the record; Dr. Hutton indicated only that Barton would have no difficulty understanding instructions "if written."  (Tr. 601) It does not logically follow that instructions not in writing would not be understood, and in any event Dr. Hutton also stated that "Mrs. Barton's ability to understand directions is within normal limits."  (Tr. 599).

Hutton's report that Barton relies on is of marginal relevance in light of the weight of the remaining evidence.

"The resolution of conflicts in the evidence and the ultimate determination of disability are for the ALJ, not the courts." Pagan-Figueroa v. Commissioner of Social Sec., 623 F. Supp. 2d 206, 209 (D.P.R. 2009) (citing Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir.1981)). In arguing that the ALJ should have further discussed the functional limitations outlined by Dr. Hutton, Barton relies heavily on a Seventh Circuit decision which found an ALJ's RFC determination to be inadequate where the ALJ did not account for evidence in the record documenting the claimant's mental limitations. Young v. Barnhart, 362 F.3d 995, 1002 (7th Cir. 2004). The court in that case noted that this omission resulted in a failure to build an "accurate and logical bridge from the evidence to [the ALJ's] conclusion." Id. The facts of Young are easily distinguishable from this case, however. In Young the record contained "substantial evidence" of the claimant's problems with criticism and instruction, but the RFC said nothing about whether the claimant's ability to interact with supervisors was limited. Id.

15

Here, in contrast, the ALJ noted that he had considered Dr. Hutton's medical opinion, specifically referencing Dr. Hutton's judgment that Barton was limited in her ability to interact with others and make work-related decisions.  (Tr. 11).  The ALJ explicitly stated that Dr. Hutton's opinions were "accorded substantial weight."  (Tr. 14).  In fact, the ALJ fully incorporated those opinions into the RFC, finding Barton had "moderate difficulties" with regards to social functioning, concentration, persistence, and pace.  (Tr. 11).  Based on the very evidence that Barton now claims was ignored, the ALJ determined that while Barton could handle "simple, repetitive, routine tasks" and "occasional interaction with co-workers and supervisors," she could not "tolerate interaction with the public."  (Tr. 12).  These limitations appropriately capture all of Dr. Hutton's opinions.  The fact that the ALJ did not quote every sentence from Dr. Hutton's report does not make his RFC determination any less appropriate.  See Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557, 1990 WL 152336, at *1 (1st Cir. 1990)(per curiam, table decision)("An ALJ is not required to expressly refer to each document in the record, piece-by-piece."); see also Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) (noting that "[w]hen, as here, the evidence of record

16

permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him").

In any event, the phrases from Dr. Hutton's report that Barton relies on are equivocal at best.  Dr. Hutton's report suggests only that Barton's ability to concentrate is "problematic," noting that it is "quite likely" that she "could" have difficulty completing tasks.  Dr. Hutton also never indicated what she meant by a "comfortable setting"[9] and never opined that Barton was actually incapable of work.  None of these statements are akin to a conclusion that Barton could not complete simple, repetitive, routine tasks that involve only occasional interaction with co-workers and supervisors, as the ALJ determined.  Thus, this is not a case where Barton can argue that the ALJ improperly ignored a medical opinion altogether in his RFC.  See Nguyen, 172 F.3d at 35 (noting that the ALJ "was

---

[9] Barton argues that because this term was not defined, the ALJ was "obligated" to clarify its meaning with Dr. Hutton, citing to 20 C.F.R. § 416.912(e) for this requirement.  That regulation describes only what happens when the "evidence is inadequate to determine whether [the claimant is] disabled."  That determination is for the ALJ, and there is no indication that Dr. Hutton's somewhat equivocal statements rendered it impossible for the ALJ to determine whether Barton was disabled in light of the entirety of the evidence that was presented at the hearing.

not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion").

Finally, even if the ALJ had not sufficiently referenced and incorporated Dr. Hutton's opinion into his RFC determination, his conclusions would still be justified by the additional evidence available in the administrative record. See Arroyo v. Barnhart, 295 F. Supp.2d 214, 220-21 (D. Mass. 2003) ("[A]n administrative law judge's decision can still pass muster if the other reasons given to accord medical reports little weight are adequately supported."). As the ALJ explained, he also based his RFC decision on Barton's testimony at the hearing, on her treatment and symptom history, and on the opinion of Karen Gilbert, A.R.N.P, a neurological nurse. First, the ALJ properly considered that Barton attempted to obtain treatment for her mental health issues only sporadically and that she did not seek individual therapy despite being ordered to do so in 2007. See Ortiz, 955 F.2d at 769 (holding that gaps in claimant's medical record may be considered as evidence that an injury is not as severe as alleged).

Moreover, Barton herself stated at the hearing that she could "probably" do a job involving simple, repetitive tasks as long as it did not involve a lot of social interaction. (Tr.

18

41).  Barton also testified that her daily activities included
caring for her children, running errands, and cleaning the house
with help from her mother, aunts, and grandmother, and that she
is generally independent for all activities of daily living.
(Tr. 597-99).  The ALJ was entitled to take these facts into
account when considering Barton's RFC.  See Avery v. Sec'y of
Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986).  While
Barton argues that these daily activities are insufficient
evidence to support the RFC, the ALJ clearly only relied upon
them as one factor among many supporting his determination.  The
fact that Barton did not testify that she was capable of
performing each of the daily activities for forty hours a week
does not prevent the ALJ from considering them.  See id.

     Finally, Gilbert opined that Barton experienced only mild
limitations in her ability to understand, remember, and carry
out simple instructions, and her ability to make judgments on
simple or complex work-related decisions.  (Tr. 593).  She added
that Barton had only moderate limitations in her ability to
understand, remember, and carry out complex instructions.  (Tr.
593).  While the ALJ correctly noted that Gilbert's opinion was
due less weight because she was not an acceptable medical
source, it was nevertheless appropriate to consider her

conclusions in the overall RFC determination.  See 20 C.F.R. §
404.1520.  At no point did Gilbert (or any physician) opine that
Barton was unable to work.  Overall, Dr. Hutton's equivocal
language regarding Barton's possible limitations, which were
accounted for in the ALJ's RFC in any event, are insufficient to
overcome the substantial evidence that supported the ALJ's RFC
determination.

**B.    Other Work in the National Economy**

Turning briefly to Barton's second argument, she claims
that the ALJ erred at step five in the sequential evaluation
process when he found that she could perform other work in the
national economy.  In reaching this conclusion, the ALJ relied
on the testimony of a vocational expert.  The ALJ asked the VE
to assume a hypothetical person with Barton's RFC, and the VE
responded that an individual with the limitations imposed by the
ALJ could perform other work as a small products assembler or
assembly machine tender.

Barton correctly notes that a VE's conclusions are improper
if the hypotheticals presented to him are not based on
conclusions supported by the medical record.  See Arocho v. Sec.
of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982)
(holding that "in order for a vocational expert's answer to a

hypothetical question to be relevant, the inputs into that
hypothetical must correspond to conclusions that are supported
by the outputs from the medical authorities"). Barton's only
argument, however, is that the ALJ failed to incorporate all of
the limitations noted by Dr. Hutton into the hypothetical
questions that he posed to the VE. Barton's arguments on this
issue are identical to her previous contention that the ALJ did
not adequately incorporate Dr. Hutton's medical opinion into his
RFC, and so it is unavailing for the reasons I have already
discussed.

## IV. <u>CONCLUSION</u>

The ALJ did not err at any step in the five-step process.
For the foregoing reasons, I grant the Commissioner's Motion to
Affirm the Decision of the Commissioner (Doc. No. 9) and deny
Barton's Motion to Reverse (Doc. No. 7). The clerk is directed
to enter judgment accordingly and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

June 14, 2011
cc: Raymond J. Kelly, Esq.
    Robert J. Rabuck, AUSA

21